**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                                    )
**In re**                                                         )
                                                                    )
**AMERICAN CARTAGE, INC.,**                    )
                                                                    )          **Civil Action No.**
              **Debtor.**                                       )          **10-40017-FDS**
                                                                    )
_____)
                                                                    )
                                                                    )
**CITY SANITATION, LLC,**                          )
                                                                    )
              **Appellant,**                                   )
                                                                    )
**v.**                                                               )
                                                                    )
**JOHN A. BURDICK, as Chapter 7 Trustee;**  )
**ALLIED WASTE SERVICES OF**                  )
**MASSACHUSETTS, LLC; and WILLIAM**      )
**ZOLL,**                                                        )
                                                                    )
              **Appellees.**                                   )
_____)

**MEMORANDUM AND ORDER**
**ON APPEAL FROM BANKRUPTCY COURT**

**SAYLOR, J.**

This is an appeal from a final order of the United States Bankruptcy Court for the District

of Massachusetts. The order at issue (1) found that the Chapter 7 Trustee had exclusive standing

to prosecute claims brought by appellant City Sanitation, LLC against appellees Allied Waste

Services of Massachusetts, LLC and William Zoll, and (2) approved settlement of those claims.

For the reasons set forth below, the order of the Bankruptcy Court will be affirmed.

I.      **Background**

A.      **The Chapter 11 Filing**

On July 23, 2003, debtor American Cartage, Inc., a trash disposal company, filed a

bankruptcy petition under Chapter 11.  (App. at 51-52).[1]  Financial Federal Credit, Inc. ("FFCI"),

was American's senior secured creditor.  (*Id.* at 75).  At the time of the bankruptcy filing,

American owed FFCI $175,491.  (*Id.*).  Pursuant to an August 23, 2002 security agreement,

FFCI also retained a perfected security interest in certain of American's property.  The property

was described in the security agreement as

> all goods, inventory, equipment, accounts, accounts receivable, chattel paper,
> documents, instruments, contract rights, general intangibles, investment property,
> securities entitlements, deposit accounts, fixtures and other property, wherever
> located now or hereafter belonging to [American] or in which [American] has any
> interest, and in all proceeds, insurance proceeds, substitutions, replacement parts,
> additions and accessions of and/or to all of the foregoing (collectively, the
> "Collateral").

(*Id.* at 293, ¶ 1).

In July 2003, the Bankruptcy Court entered various orders authorizing American to use

cash collateral subject to FFCI's security interest.  (*Id.* at 301, July 25 order; *id.* at 302, July 31

order).  The orders granted FFCI "replacement liens in the same collateral and same priority as

currently exists, as adequate protection for any diminution of [its] position."  (*Id.*).

On August 4, 2003, the Office of the United States Trustee filed an "Emergency Motion

to Dismiss Case or to Convert Case to Case under Chapter 7."  (*Id.* at 59-65).  The motion

averred generally that American had failed to obtain business liability insurance and, as a result,

was placing the general public and its creditors at substantial financial risk.  (*Id.* at 59).  On

---

[1] "App." refers to the Record Appendix filed by City.  (*See* Doc. 8).

August 5, the Bankruptcy Court directed the appointment of a Chapter 11 Trustee to administer American's bankruptcy estate.  (*Id.* at 66).  The next day, John A. Burdick was appointed as Trustee and replaced American's management.  (*Id.* at 67).

On September 4, acting upon a request by the Trustee, the Bankruptcy Court authorized the hiring of William M. Zoll to serve as controller and office manager and to assist the Trustee in American's day-to-day ongoing business operations.  (*Id.* at 86).  Zoll was hired and performed those roles from late 2003 to the beginning of 2005.

### B. The Chapter 7 Conversion

On January 20, 2005, after administering the estate for approximately 18 months, the Trustee filed a motion to convert the case to a Chapter 7 proceeding.  (*Id.* at 88-89).  In support of the motion, the Trustee stated that "it does not appear that [American] will be able to file a viable Plan of Reorganization."  (*Id.* at 88).  The Trustee testified in a later hearing that the conversion was necessary because "there were continuing losses of the estate – we had some post-petition wage claims and other administrative claims – and the debtor just wasn't – simply wasn't generating enough cash."  (*Id.* at 417).  In particular, American was faltering in its efforts to provide waste disposal services for its clients, many of whom are located in the North End neighborhood of Boston and are required to have their trash collected each day in order to comply with local health ordinances.  (*Id.* at 176-77, 420).  With the Trustee's knowledge and consent, Zoll sought another waste disposal company to service American's customers.  (*Id.* at 177).  Zoll advised the trustee that he had contacted Allied and that Allied was willing to provide waste disposal services to American's customers.  (*Id.*).  The Trustee asserts that he had no objection to Allied providing waste removal services so long as American's estate did not incur

any further expenses.  (*Id.*).

On February 7, 2005, the Bankruptcy Court granted the Trustee's motion, and converted American's Chapter 11 case into a Chapter 7 liquidation, and Burdick was retained as Chapter 7 Trustee.  (*Id.* at 141-42).

Allied subsequently hired Zoll as an employee.  (*Id.* at 177).

### C.      FFCI Seeks Relief from the Automatic Stay

On February 1, 2005, FFCI moved in the Bankruptcy Court for an order granting it relief from the automatic stay and seeking authority to take possession of and sell the collateral that was subject to its August 2002 security agreement with American.  (*Id.* at 93-98).  Because liquidation was imminent, the collateral was no longer necessary to an effective reorganization. (*Id.* at 97).  FFCI requested authority to apply the proceeds of such a sale to satisfy the debt owed by American.  (*Id.* at 98).  On February 7, the same day the Bankruptcy Court converted American's case to a Chapter 7 proceeding, it also entered an order granting FFCI relief from the stay and ordering American to turn over two tractors, a hoist, and other equipment that was subject to FFCI's security interest (the "Equipment Collateral").  (*Id.* at 143-44).

On March 14, 2005, FFCI (joined by the Trustee) filed a joint second motion for relief from the automatic stay, this time requesting that it be allowed to take possession of and sell the remaining assets that were subject to its security interest (the "Other Collateral").  (*Id.* at 145-58).  The motion represented that FFCI had agreed to sell the Equipment Collateral at a private sale to a company known as Todesca Equipment Co., Inc. for purchase price of $115,000, and that Todesca had offered to purchase the Other Collateral for $27,500.  (*Id.* at 151).  The Trustee assented to the motion on the condition that he receive $12,500 in carve-out funds to be used to

pay for certain administrative expenses.  (*Id.* at 151-52).  Finally, FFCI represented that

> [t]he amounts realized from the sale of the Other Collateral, after accounting for
> the sale of the Equipment Collateral, will be sufficient only to pay the amounts
> due and owing from [American] to FFCI and those administrative or priority
> claims paid from the carve-out funds.

(*Id.* at 152).

The joint motion included a proposed "Order Granting Relief from Stay" to be used

should the Bankruptcy Court grant the motion.  (*Id.* at 157-58).  As the Bankruptcy Court later

acknowledged, the proposed order's description of the "Other Collateral" was "far more

expansive" that the August 2002 security agreement's description of collateral.  (Bankr. Mem. at

2).  In particular, the proposed order included the following language, which was not present in

the security agreement:  "trade names, service names, service marks, telephone numbers, [and]

choses in action."  (*Id.*; App. at 157).[2]  Nevertheless, on March 20, 2005, the Bankruptcy Court

granted the joint motion and signed the order in the form proposed by the parties.  (App. at 159-

60).  The order authorized FFCI to

> enforce all of its rights under its security interest in the foregoing Other
> Collateral, including, without limitation, selling the Other Collateral at [a] public
> or private sale in accordance with applicable state law, and applying any proceeds
> of sale to any and all of its claims against [American].

(*Id.* at 160).  FFCI subsequently sold the assets that were subject to its security interest to

Todesca for $144,500, which is $2,000 more than FFCI had represented that Todesca was

willing to pay.  (*Compare id.* at 231-32, *with id.* at 151).  In its appendix filed with this Court,

---

[2] A "chose in action" is defined in part as a "proprietary right in personam, such as a debt owed by another
person, a share in a joint-stock company, or a claim for damages in tort; . . . the right to bring an action to recover a
debt, money, or thing." BLACK'S LAW DICTIONARY 275 (9th ed. 2009).  *See also Sarah Michaels, Inc. v. Certified
Packaging Corp. (In re Sarah Michaels, Inc.)*, 358 B.R. 366, 374 (Bankr. N.D. Ill. 2007) (a "chose in action" is
"akin to an instance where a party has a 'cause' for some duty due to him or her, or something similar to 'rights'
under a contract or a breach of that contract").

City Sanitation, LLC ("City") for the first time included a bill of sale showing that Todesca resold these assets to City in April 2005 for $147,000, $2,500 more than Todesca paid.  (App. at 314-16; *see* Bankr. Mem. at 2).      The Trustee thereafter presided over the winding-down of American's estate.  On November 15, 2007, the Trustee filed a "Final Report And Account After Distribution And Request For Discharge."  (*Id.* at 38, 161-65).   The report showed that, in addition to the proceeds received by FFCI in satisfaction of its claims, $12,631.35 had been paid to administrative and priority creditors, but that general unsecured creditors had not received a distribution.  (*Id.* at 38, 161-65).  On November 16, the Bankruptcy Court entered an order approving the final report and closing the case.  (*Id.* at 38, 166).

### D.    <u>City Sues Allied and Zoll in State Court</u>

On February 7, 2007, while the bankruptcy case was still pending and without notice to the Trustee, City filed a complaint in Middlesex Superior Court against Allied and Zoll.  (*Id.* at 203-32, 418).[3]  City contended that it was the "successor-in-interest" to American and asserted various claims in that capacity, including claims for conversion, interference with contractual relations, interference with an advantageous relationship, breach of fiduciary obligation, civil conspiracy, and RICO.  (*Id.* at 204, 213-21).  Generally, the complaint alleged the following: that during the pendency of the bankruptcy, and after he had obtained control over American's assets, Zoll engaged in a systematic effort to divert the estate's assets to his own benefit and to conceal the diversion from the Trustee and the Bankruptcy Court; that even though Allied was aware that American was in bankruptcy, Allied then hired Zoll as an employee; that it offered to pay Zoll a commission for each customer it diverted from American to Allied; that Zoll, in turn,

---

[3] City was represented by the law firm of Newman & Newman, the same office that formerly served as American's bankruptcy counsel.  (*See* App. at 61, 221).

contacted a number of American's customers and advised them that their contact with American

had been purchased by or assigned to Allied; that Allied then removed all the trash containers

bearing American's logos, and replaced them with containers bearing the logo of Allied; and that

it never returned American's containers.  (*Id.* at 207, 212).  According to City, none of these

transactions occurred during the ordinary course of business.  (*Id.* at 208).

> **E.**     **The Trustee Learns of the State-Court Complaint**

Sometime in the spring of 2009, Allied's attorney contacted the Trustee and informed

him of the existence of the state-court action.  (*Id.* at 419).  After some investigation, the Trustee

concluded that the claims being pursued by City as American's purported "successor-in-interest"

were actually the property of the bankruptcy estate because they arose against American during

the course of bankruptcy proceedings.  (*Id.* at 418-19).  As a result, in the Trustee's view, he was

the only person with standing to prosecute them.  (*Id.* at 418-19).  The Trustee and Allied then

negotiated a settlement of the claims.  (*Id.* at 419).

> **F.**     **The Bankruptcy Court's Decision**

On June 3, 2009, the Trustee filed a motion in the Bankruptcy Court seeking to reopen

the case, which was granted on June 17.  (*Id.* at 38, 167-71, 172).  On June 19, the Trustee filed a

motion for an order (a) finding that he had exclusive standing to prosecute the state-court claims

by City, and (2) approving the settlement entered into by the Trustee and Allied.  (*Id.* at 173-89).

Allied joined in the motion, which was opposed by City.  (*Id.* at 40-41, 237-69).  On October 29,

2009, the Bankruptcy Court held a hearing on the Trustee's motion, which it later granted in a

written decision issued on December 11, 2009.  (*Id.* at 414-33, 434-48).

The Bankruptcy Court found that FFCI did not have a security interest in American's

"choses in action" because they were not part of the collateral described in the August 2002 security agreement.  (Bankr. Mem. at 7).  The order granting relief from the automatic stay, which described the collateral in broader terms, could not have operated to transfer an interest that did not already exist.  (*Id.*).  And because FFCI did not have an interest in American's choses in action, Todesca could have not purchased them, nor could it then have transferred them to City.  (*Id.*).  The Bankruptcy Court also concluded that the security agreement did not give FFCI an interest in American's commercial tort claims, nor did FFCI obtain title to the claims as proceeds of its collateral.  (*Id.* at 8-11).  The Bankruptcy Court then rejected City's argument that the Trustee had abandoned the claims upon the closing of the original bankruptcy case.  (*Id.* at 12).  Finally, while doubting that City had standing the challenge the Trustee's settlement agreement with Allied, the Bankruptcy Court nevertheless concluded that the agreement satisfied the four-part test outlined in *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995).

On December 22, 2009, City filed a timely notice of appeal.  (App. at 450, 454).

## II.    Jurisdiction and Standard of Review

This Court has jurisdiction to hear appeals from final judgments, orders, and decrees of the Bankruptcy Court.  28 U.S.C. § 158(a).  The Bankruptcy Court's findings of fact are reviewed for clear error and its conclusions of law are reviewed *de novo*.  *See In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009).[4]  This Court "may affirm, modify, or reverse [the Bankruptcy

---

[4] City contends that the Bankruptcy Court did not make findings of fact and, therefore, that this Court's review is plenary.  That contention is incorrect.  Although the Bankruptcy Court did not use the formal term "findings of fact," its order contains five pages of factual findings under the heading "FACTS."  ( *See* Bankr. Mem. at 1-5).  Nor does the Bankruptcy Court's failure to hold an evidentiary hearing undermine this Court's deferential review of its findings of fact.  This Court owes deference to such findings "whether based on oral or documentary evidence."  Fed. R. Bankr. P. 8013.

Court's order] or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.

## III.   Analysis

### A.   Scope of Issues on Appeal

The Court must first address what issues City has preserved for appeal.  In its

"Designation of the Record on Appeal and Statement of the Issues," City listed three issues for

review.  (App. at 455-57).[5]  In its opening brief, however, it listed eight.  The Trustee contends

that the omission of five issues for review from its designation runs afoul of Fed. R. Bankr. P.

8006, which requires the appellant to furnish a "statement of the issues to be presented."  *See*

*Zimmerman v. Jenkins (In re GGM, P.C.)*, 165 F.3d 1026, 1032 (5th Cir. 1999) (holding that

"even if an issue is argued in the Bankruptcy Court and ruled on by that court, it is not preserved

for appeal under Rule 8006 unless the appellant includes the issue in its statement of issues on

appeal.").  In the Trustee's view, City has waived the following five issues by failing to list them

in its designation:  (1) the Bankruptcy Court erred when it found that City's claims are

"commercial tort claims" within the meaning of the Uniform Commercial Code; (2) the

Bankruptcy Court erred when it found that City lacked standing to bring the state-court action

because the claims purportedly diminished the bankruptcy estate "generally"; (3) the Bankruptcy

Court erred when it ruled that City may not prosecute the state-court action because the

underlying debt has been paid in full from the proceeds of the foreclosure sale; (4) the Chapter 7

trustee abandoned the state-court claims; and (5) the Chapter 7 trustee should be estopped from

---

[5] City listed the following three issues in its "statement of the issues":  (1) "Whether City Sanitation, LLC, as successor in interest to Financial Federal Credit, Inc., has the exclusive right to prosecute claims against parties that misappropriated assets of the debtor, American Cartage, Inc.?"; (2) "Whether the choses in action being pursued by City Sanitation, LLC constitute 'proceeds' of collateral?"; and (3) "If the Court finds that the Chapter 7 Trustee has exclusive right to prosecute claims against parties that misappropriated assets of the debtor, whether the Trustee met his burden to demonstrate that the proposed settlement should be approved?"  (App. at 456-57.)

asserting any rights to the state-court claims.  City, however, argues that each of the five unlisted issues in its brief can be inferred from the three listed issues in its statement, and so have not been waived.  *See In re Freeman*, 956 F.2d 252, 255 (11th Cir. 1992) (an issue will be considered waived on appeal if it was not listed pursuant to Rule 8006 and is "not inferable from the issues that are listed").

The purpose of Rule 8006 is to ensure an orderly procedure and to provide notice to the reviewing court and the other parties of the issues as to which appellate review is sought.  *See In re Trans World Airlines*, 145 F.3d 124, 132 (3d Cir. 1998).  Although not listed in appellant's statement of issues, an issue may be preserved on appeal if it can be reasonably inferred from an issue that is listed.  *See In re Freeman*, 956 F.2d at 255 (citing *Energrey Enters., Inc. v. Oak Creek Energy Sys., Inc.*, 119 B.R. 739, 741 (E.D. Cal. 1990) (declining to consider an issue that "is not listed and is not inferrable from the issues listed")); *Raskin v. Malloy*, 231 B.R. 809, 811 (N.D. Okla. 1997) (same); *but see In re GGM, P.C.*, 165 F.3d at 1032.  If an unlisted issue is conceptually distinct from the listed issues or implicates "very different factual and legal analyses," it may be deemed waived.  *In re Trans World Airlines*, 145 F.3d at 132.

City contends that its first listed issue ("[w]hether City . . . has the exclusive right to prosecute claims against parties that misappropriated assets of . . . American") encompasses three unlisted issues.  In City's view, the questions of (1) whether its claims are "commercial tort claims" or "proceeds," (2) whether its claims allege general harm to the estate or particularized harm, and (3) whether American's underlying debt was fully satisfied are all sub-issues of the standing question.  The Court agrees.  The resolution of each of those sub-issues has implications for the standing analysis, as they are each components of City's larger argument

that it alone owns the claims brought against Allied and has standing to assert them. If City's state-court claims are classified as commercial tort claims or as alleging general harm to the estate, only the Trustee has standing to prosecute those claims. Likewise, if the sale of American's assets satisfied FFCI's underlying security claim, the Trustee alone can bring any related state-court claims. As three components of the larger standing question, each of those three unlisted issues can be reasonably inferred from City's first listed issue. *See In re National Lumber & Supply, Inc.*, 184 B.R. 74, 79 (B.A.P. 9th Cir. 1995); *In re Freeman*, 956 F.2d at 255. Accordingly, these issues are preserved on appeal.

City further contends that its third listed issue ("whether the Trustee met his burden to demonstrate that the proposed settlement should be approved") encompasses the unlisted issues of abandonment and equitable estoppel. City contends that if the Trustee had abandoned all future claims by assenting to the Bankruptcy Court's order to foreclose, he would not have had authority to enter settlement negotiations with Allied. But if the Trustee had not abandoned the claims, separate questions would arise about the propriety of the settlement. That is, a conclusion that the Trustee did not abandon state-law claims has no impact on the settlement analysis. The two issues are conceptually distinct. *See In re Trans World Airlines*, 145 F.3d at 132. Moreover, the legal analyses for these questions are entirely different. Sections 541 and 554 of the Bankruptcy Code govern abandonment of estate property, 11 U.S.C. §§ 541(a)(7), 554(c), 554(d), while review of the settlement is controlled by the factors in *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995). The unlisted abandonment issue therefore cannot be inferred from the listed settlement issue, and will be deemed waived. *See In re Freeman*, 956 F.2d at 255; *Raskin* , 231 B.R. at 811; *Energrey Enters.*, 119 B.R. at 741.

11

Finally, the equitable estoppel issue may be disposed of readily, as City offers no argument as to why that issue is encompassed by any listed issue.  Unquestionably, the application of equitable estoppel is conceptually distinct from the propriety of the settlement, and the legal analyses are entirely different.  Furthermore, and in any event, City never raised the theory of equitable estoppel in Bankruptcy Court.  It is a "fundamental rule" that a legal theory raised for the first time on appeal is waived, absent "the most extraordinary circumstances." *Teamsters Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir. 1992); *see also Iannochino v. Rodolakis (In Re Iannochino)*, 242 F.3d 36, 43 n.5 (1st Cir. 2001); *Fleet Mortg. Grp., Inc. v. Kaneb*, 196 F.3d 265, 268 (1st Cir. 1999).  City alleges no such extraordinary circumstances here.  Accordingly, because the equitable estoppel issue was not in City's statement of issues and is raised for the first time on appeal, the Court will decline to address it. *See In re Trans World Airlines*, 145 F.3d at 131 (holding that "when the Bankruptcy Court had not had the opportunity to apply its unique expertise in deciding" an unlisted issue, the district court appropriately declined to address the claim).

**B.      Standing to Prosecute the State Court Claims**

The central issue in this appeal is whether the Trustee or City has standing to assert the tort claims in state court.  As an alleged "successor in interest" to FFCI, City contends that it alone has standing to prosecute the claims, because it purchased "choses in action" from Todesca.  Alternatively, City asserts that the state-law claims are "proceeds" flowing from the collateral, not commercial tort claims.  If the claims are proceeds of the collateral, then, in City's view, they were properly transferred from FFCI through Todesca to City, which alone has standing to assert the claims.  Finally, City contends that the torts that it alleges occurred led to

12

distinct and particularized harm to FFCI's collateral, not generalized harm to the estate.

The Trustee and Allied jointly urge the Court to affirm the Bankruptcy Court's finding that the Trustee alone has standing to assert the state-law claims. In the Trustee's view, the estate's debt to FFCI was paid in full at the liquidation sale, so the secured interest of FFCI and any successors has been satisfied. Even if the security interest was not satisfied, the Trustee contends that as the representative of the estate, he alone has standing to assert commercial tort claims alleging general harm to the estate.

### 1.   <u>The Satisfaction of FFCI's Security Interest</u>

As an initial matter, the Court must address whether FFCI's security interest was fully satisfied in the liquidation sale. The parties dispute the Bankruptcy Court's finding that "FFC[I]'s debt was paid in full from the proceeds of the sale." (Bankr. Mem. at 11). In City's view, this statement by the court was "conclusory" because it was not decided at an evidentiary hearing or based on evidence in the record. City further contends that the evidentiary record indicates that FFCI's interest was *not* paid in full. In March 2005, when the sale of American's assets occurred, FFCI was owed approximately $140,000; the secured assets were sold to Todesca for $144,500. (*See* App. at 150-51, 231-32). City contends that after subtracting the $12,500 payment to the Trustee, FFCI only received $132,000, an amount not sufficient to satisfy the debt. The Trustee disagrees, noting that FFCI represented to the Bankruptcy Court that the sale would be "sufficient only to pay the amounts due and owing from the Debtor to FFCI . . ." (*Id.* at 152, ¶ 11 ).

Although the Bankruptcy Court's statement that "FFC[I]'s debt was paid in full from the proceeds of the sale" was not included in its finding of facts, both parties characterize the

statement as a finding of fact.  This Court will accept the parties' characterization,

notwithstanding the absence of a formal finding.  *See In re Healthco Intern.*, 132 F.3d 104, 108

(1st Cir. 1997) ("[T]he Bankruptcy Court's failure to articulate any particularized factual

findings . . . makes clear-error review exceptionally difficult.").

Findings of fact stemming from a paper or documentary record are entitled to the same

deference inherent in clear-error review as findings of fact that stem from live testimony.  Fed.

R. Bankr. P. 7052 (adopting Fed. R. Civ. P. 52(a)) ("Findings of fact, whether based on oral or

documentary evidence, shall not be set aside unless clearly erroneous . . ."); s*ee also In re

Healthco Intern.*, 132 F.3d at 108.  The Bankruptcy Court, however, did not cite to the evidence

on which it relied to find that FFCI's security interest was satisfied.  The only evidence as to

whether FFCI's interest was paid in full is the bill of sale, which indicates a sale price of

$144,500.  (App. at 231-32).  After subtracting the payment to the Trustee of $12,500 for

administrative expenses, FFCI recovered $132,000.  Without evidence to the contrary, the only

reasonable conclusion is that there was an $8,000 deficiency in the satisfaction of American's

debt to FFCI.  Moreover, FFCI's representation to the Bankruptcy Court was only a prospective

statement that it expected the debt to be satisfied ("the amounts realized from the sale . . . will be

sufficient only to pay the amounts due and owing from the Debtor to FFCI" (App. at 152, ¶ 11)),

not an assertion of an existing fact.  There is no evidence from after the sale suggesting that

American's debt to FFCI *was* in fact satisfied.  Accordingly, to the extent that the Bankruptcy

Court found that FFCI's debt was paid in full, it was clearly erroneous.  *See In re Hill*, 562 F.3d

at 32.

Nonetheless, the assumption that FFCI had an $8,000 deficiency in satisfaction of its debt

14

that transferred to City will not change the outcome of this appeal.  As discussed below, the

Court concludes that the Trustee had exclusive standing to prosecute the state-law claims

asserted by City as commercial tort claims.  Whether or not FFCI's debt was fully satisfied does

not affect which party has standing to litigate or settle the state-law claims.

### 2.      The Nature of the State-Law Claims

The next issue is whether the state-law claims are commercial tort claims or proceeds

from FFCI's collateral.  The parties agree that in the absence of statutory language to the

contrary, "[t]he rights of the parties are determined by the [security] agreement between them."

*See Mechanics Nat'l Bank of Worcester v. Killeen*, 377 Mass. 100, 107 (1979).  The security

agreement here did not convey to FFCI an interest in commercial tort claims, but did convey a

security interest in  "all . . . other property, wherever located, now or hereafter belonging to

Debtor or in which Debtor has any interest, and in all proceeds."  (App. at 293.)

Because the security agreement created (and defined) FFCI's security interest, the terms

added to the subsequent Order granting FFCI relief from the automatic stay could not enlarge its

collateral.  FFCI had a valid security interest in the collateral specified in the security agreement,

and the string of subsequent replacement liens only extended its interest in "the same collateral."

(App. at 301; *see also* App. at 302).  City's reliance on the terms of the 2005 Order and FFCI's

bill of sale, which purportedly transferred "choses in action" from FFCI to Todesca, is

unavailing.  FFCI did not have a security interest in any "choses in action," so it could not have

transferred any such rights to Todesca.[6]  The Bankruptcy Court was correct that "a secured

---

[6] The security agreement's after-acquired property clause, transferring "other property, wherever located now or hereafter belonging to [American] or in which [American] has any interest" to FFCI as collateral, cannot be read to encompass choses in action, causes in action, or commercial tort claims.  The UCC exempts commercial tort claims from categories of collateral that can be transferred through an after-acquired property clause.  Mass. Gen.

creditor can only sell and deliver title to those assets in which it had a valid security interest."
(Bankr. Mem. at 7).

Having concluded that City did not purchase "choses in action" from Todesca, the next
issue is whether the state-law claims are classified as commercial tort claims or proceeds.  A
commercial tort claim is, in relevant part, "a claim arising in tort with respect to which: the
claimant is an organization."  Mass. Gen. Laws ch. 106, § 9-102(13)(A).  The state-law claims at
issue—conversion, tortious interference with contractual and business relations, breach of
fiduciary duty, and civil conspiracy—indisputably arise in tort.  *See* RESTATEMENT (SECOND) OF
TORTS §§ 222A (conversion), 766 (interference with contractual relations, interference with
advantageous relations), 874 (breach of fiduciary duty), 876 (civil conspiracy) (1979); *see also*
*In re Zych*, 379 B.R. 857, 861 (Bankr. D. Minn. 2007) (finding that under Minnesota's UCC,
conversion is a commercial tort claim); *Shirley Med. Clinic, P.C. v. United States,* 446 F. Supp.
2d 1028, 1033-34 (S.D. Iowa 2006) (finding that under Iowa's UCC, breach of fiduciary duty
claim is a commercial tort claim).  As corporations or representatives of corporations, both
parties asserting the right to the tort claims are "organizations" under the definition of a
commercial tort claim.  *See Shirley Med.*, 446 F. Supp. 2d at 1034 (finding an Iowa corporation
is an "organization" under Iowa's codification of the UCC).

When statutory text is "clear and unambiguous, the inquiry is at an end."  *Ruiz v. Bally*

---

Laws ch. 106, § 9-204(b)(2).  Additionally, in order for commercial tort claims (or, by implication, the related
notions of causes of action and choses of action) to constitute collateral, they must be itemized with specificity.  *Id.* §
9-108(e)(1) ("A description only be type of collateral defined in this chapter is an insufficient description of: a
commercial tort claim").  A broad phrase such as "commercial tort claims" or "other property" is not detailed enough
to encompass particular causes of action.  *Id.* § 9-108, Comment 5.  By contrast, "a description such as 'all tort
claims arising out of the explosion of debtor's factory' would suffice."  *Id.*  Here, the phrase "other property" in the
security agreement is sweepingly broad, defined by type alone.  It therefore does not include commercial tort claims,
causes of action, or choses of action.

*Total Fitness Holding Corp.*, 496 F.3d 1, 8 (1st Cir. 2007).  Under the plain meaning of the

statute, therefore, the state-law claims at issue are commercial tort claims.  *See Helms v.*

*Certified Packaging Corp.*, 551 F.3d 675, 679 (7th Cir. 2008) (corporation's negligence actions

were commercial tort claims within section 9-102(a)(13)(A) of the UCC).

City contends that such a straightforward application of the statutory definition of

commercial tort claim is "overly simplistic."  (Appellant's Br. at 23).  Instead, City classifies the

state-law claims as "proceeds" of collateral.[7]  City relies on *Helms* for the proposition that claims

arising out of damage to collateral are proceeds reachable by a secured creditor.  *See* 551 F.3d at

678.

In *Helms*, a fire destroyed equipment that served as collateral under a security agreement.

*Id.* at 677.  The debtor corporation negotiated a settlement in a subsequent negligence claim, and

the secured creditor sought to recover the value of the settlement as "proceeds" of the damaged

collateral.  *Id.*  The court reasoned that the negligence claims were "commercial tort claims"

under the UCC, but a monetary *award* received in compensation for damage to collateral

constituted "proceeds."  *Id.* at 678 ("If a suit against someone who steals or damages collateral

eventuates in an award measured by the diminution in the value of the collateral caused by the

defendant's wrongdoing, so that the award restores the original value of the collateral, the award,

like an insurance payment for damaged collateral constitutes 'proceeds' of the collateral and is

therefore covered by the lender's security interest.")  That is, according to *Helms*, "proceeds"

include money awards obtained in compensation for damage to collateral, but *not* the right to

---

[7] Under the UCC, "'Proceeds' . . . means the following property: . . . (B) whatever is collected on, or distributed on account of collateral; (C) rights arising out of collateral; (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringements of rights in, or damage to, the collateral . . ."  Mass. Gen. Laws ch. 106, § 9-102(a)(64).

assert the tort claims that bring about the awards.  *See id.* ("[T]he judgment obtained in [a hypothetical conversion] suit would constitute proceeds of the collateral up to its value."); *accord In re Wiersma*, 283 B.R. 294, 304 (Bankr. D. Idaho 2002) (any "settlement payment represents compensation to Debtors for the loss of and damage to [secured party's] collateral and must be considered proceeds").  Thus, under *Helms*, the tort claims are not themselves "proceeds."  Rather, any settlement award or judgment obtained in satisfaction of the claims (that is, as compensation for damage to FFCI's collateral) would be proceeds.

The statutory definition of "proceeds" supports this interpretation.  As the *Helms* court points out, under the UCC, a secured party is entitled to proceeds of damaged or stolen collateral only "to the extent of the value of collateral."  Mass. Gen. Laws ch. 106, § 9-102(a)(64)(D); 551 F.3d at 679 ("The claim of a secured creditor to the proceeds of collateral cannot exceed the value of the collateral.").  If a secured party is entitled to proceeds only up to the value of the collateral, proceeds conceptually are compensatory payments.  A claim to proceeds is a right to payment, but not a right to prosecute the claims themselves.  There is nothing in the statutory definition of "proceeds" that suggests that a secured party acquires standing to prosecute causes of action by virtue of a claim to proceeds.  Indeed, in *Helms*, the debtor corporation prosecuted the commercial tort claims, not the secured party.  *Id.* at 677-78.

City further contends that the tort claims here arose *after* FFCI and American executed the security agreement.  City thus contends FFCI could not have possibly included these commercial tort claims in its security agreement, because they did not yet exist.  Because the security agreement did not include commercial tort claims as collateral, City argues, the term "proceeds" in the agreement should be read to encompass a right to prosecute the state-law

18

claims.

This interpretation of "proceeds" has no support in the statute. The revised UCC excludes commercial tort claims from the definition of "accounts," thus creating a category of collateral that must be denoted with specificity. Mass. Gen. Laws ch. 106, § 9-108(e)(1). Commercial tort claims must therefore be specified by type in order to transfer an interest in them to the secured party. *Id.* § 9-108, Comment 5. Furthermore, the UCC does not permit commercial tort claims to be transferred through an after-acquired property clause. *Id.* § 9-204(b)(2) ("A security interest does not attach under a term constituting an after-acquired property clause to . . . a commercial tort claim.") If a commercial tort claim must exist before the effective date of the security agreement, standing to assert post-agreement tort claims cannot transfer unwittingly to a secured party's successors through the term "proceeds." *See id.* § 9-108, Comment 5 ("when an effective security agreement covering a commercial tort claim is entered into the claim already will exist"). Rather, the UCC requires that contracting parties deliberately specify commercial tort claims as collateral. Reading the right to prosecute tort claims into the term "proceeds" would undermine the structure and purpose of the statute.

The Court accordingly affirms the Bankruptcy Court's holding that the state-law claims are commercial tort claims that were not included in the security agreement. Standing to assert the commercial tort claims did not transfer to City through Todesca's purchase of FFCI's collateral. FFCI never had a right to prosecute American's tort claims, and thus could not have transferred that right to Todesca or City. Standing appropriately remains with the Trustee as the representative of the debtor's estate.

### 3.       The Nature of the Harm Alleged

The final standing issue is whether the nature of the harms alleged are general harms to the estate or particular harms to a creditor of the estate.  It is well-settled that the Trustee has exclusive standing to bring post-petition actions alleging harm to a debtor's estate.  *See, e.g., Lopez-Stubbe v. Rodriguez-Estrada (In re San Juan Hotel)*, 847 F.2d 931, 938 (1st Cir. 1988); *DiStefano v. Stern (In re J.D.F. Enters.)*, 233 B.R. 610, 621 (Bankr. D. Mass. 1998).  If the claim alleges general harm to the estate, the Trustee is the appropriate party to bring suit, and "the creditors are bound by the outcome of the trustee's action."  *J.D.F. Enters.*, 233 B.R. at 621. Conversely, if the claim alleges particularized injury to the assets of a creditor, then the creditor has standing to bring suit.  *Id.*

Setting aside the issue of whether City is a creditor of American, it is plain that the commercial tort claims allege general harm to American's estate.  City asserts business torts that are based on theories of generalized business losses, not losses to distinct collateral.  If the tortious actions in fact occurred, they decreased American's overall estate and its ability to pay all of its creditors.  As the Bankruptcy Court noted, the complaint repeatedly refers to harms to American's estate, not to specific collateral belonging to FFCI.  (*See, e.g.*, App. at 215, ¶ 57 ("American suffered a pecuniary loss"); 215, ¶ 59 ("The defendants . . . intentionally interfered with American's ability to perform its duties under its disposal contracts"); 216, ¶ 60 ("American suffered damage"); 216, ¶64 ("American suffered a loss"); 218, ¶ 73 ("American suffered damages as a result")).  If FFCI suffered harm because of the alleged torts, "the economic harm [it has] allegedly suffered is derivative of that suffered by the estate."  *J.D.F. Enters.*, 223 B.R. at 622.

City contends that the diminution in value of American's assets affected FFCI's ability to

recover the full value of its security interest.  But this is true for all of American's creditors.  The priority order of the creditors does not change this conclusion.  Because the right to bring the commercial tort claims remained with the Trustee and did not transfer to City, any awards from the claims flow to the estate.  The resulting payment is distributed to the creditors in accordance with their priority, through the Trustee's management of the estate.  *See J.D.F. Enters.*, 223 B.R. at 622.

The Bankruptcy Court's holding that the state-law claims allege general harm to the American's estate accordingly will be affirmed.

### C.        The Trustee's Settlement with Allied and Zoll

The final issue is whether the Bankruptcy Court properly approved of the Trustee's settlement with Allied and Zoll.  Again setting aside the issue of whether City is a creditor of American with standing to challenge approval of the settlement agreement, there is ample justification for affirming the settlement.

A Bankruptcy Court's approval of a settlement is reviewed for abuse of discretion. *Jeffrey*, 70 F.3d at 185.  A reviewing court, therefore, should not disrupt a settlement unless it "is persuaded that the trial court misconceived or misapplied the law, or misconstrued its own rules."  *Id.* (quoting *Aggarwal v. Ponce Sch. of Med.*, 745 F.2d 723, 727 (1st Cir. 1984)).

Fed. R. Bankr. P. 9019(a) authorizes a bankruptcy judge to "approve a compromise or settlement" following a motion of the trustee.  In reviewing a settlement, the bankruptcy judge should consider:  "(i) the probability of success in the litigation . . . ; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors

and a proper deference to their reasonable views in the premise." *Jeffrey*, 70 F.3d at 185 (citing *In re Anolik*, 107 B.R. 426, 429 (Bankr. D. Mass.1989)).  In weighing these factors, the court should "not substitute [its] judgment for that of the trustee." *Hill v. Burdick (In re Moorhead Corp.)*, 208 B.R. 87, 89 (B.A.P. 1st Cir. 1997), *aff'd*, 201 F.3d 428 (1st Cir. 1998).

The bankruptcy judge in this case properly applied the four factors in reviewing the settlement between the Trustee and Allied and Zoll.  *See Jeffrey*, 70 F.3d at 185.  The court took note of the Trustee's belief that the commercial tort claims were unfounded.  (Bankr. Mem. at 13-14).  Alluding to Zoll's decision to prevent health code violation claims brought against the estate for inadequate trash collection, the court credited the Trustee's belief that Allied was enlisted to satisfy American's customers' trash collection needs.  (*Id.*; App. at 420-21).  Because he anticipated issues arising in regard to the potential health code violations, the Trustee expressly represented that he felt that the probability of success in the litigation was low.  (*See* App. at 420).  The court properly credited this consideration in evaluating the probability of success in the litigation.

Second, the court acknowledged of the lack of funds in the estate to actively pursue litigation of the tort claims.  (Bankr. Mem. at 14).  Observing that a Trustee need not "forego settlement and pursue claims that he believes will yield little or no benefit to creditors," the court accounted for the interest of the creditors and expense attending litigation.  *See Jeffrey*, 70 F.3d at 185; (Bankr. Mem. at 14).  The interest of the creditors further informed the court's analysis when it recognized that the settlement "will permit administrative and priority claims to be paid in full and still yield a distribution to unsecured creditors."  *See Jeffrey*, 70 F.3d at 185; (Bankr. Mem. at 14).

This reasoning led the court to concluding that the Trustee had met his burden of satisfying the *Jeffrey* test.  (Bankr. Mem. at 14).  The court properly addressed three of the *Jeffrey* factors.  *See Jeffrey*, 70 F.3d at 185.  There is no basis for finding that the court misapplied or misconstrued the *Jeffrey* factors, and thus no grounds for finding that the court abused its discretion.  *See id.*  Accordingly, the Bankruptcy Court's approval of the settlement is affirmed.

**IV.**     **Conclusion**

For the foregoing reasons, the order of the Bankruptcy Court dated December 11, 2009, finding that the Trustee had exclusive standing to prosecute claims brought by City Sanitation, LLC, and approving the settlement with Allied Waste Services of Massachusetts, LLC, is AFFIRMED.

**So Ordered.**

 /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 30, 2010